UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| KEVIN D. SNODGRASS JR., | ) | |
|     Plaintiff, | ) | Case No. 7:14cv00269 |
| | ) | |
| v. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| A. DAVID ROBINSON, *et al.*, | ) | By:    Joel C. Hoppe |
|     Defendants. | ) | United States Magistrate Judge |

       Kevin D. Snodgrass Jr., a state inmate proceeding *pro se*, filed suit under 42 U.S.C. §§ 1983 and 2000cc-1, alleging that the Virginia Department of Corrections' ("VDOC") master pass list policy, 841.3 § IV.A.3(a)–(b), violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment to the United States Constitution.[1] *See* Am. Compl. ¶¶ 5, 26, 28, 32, 36, ECF No. 7-1. Snodgrass also alleges that three defendant prison officials violated his rights under RLUIPA and the First and Fourteenth Amendments when, in applying the VDOC policy, they refused his requests to observe the Ramadan fast at Red Onion State Prison ("ROSP") in 2013. *See id.* ¶¶ 4, 6–8, 28, 36.

       The Defendants' motion for summary judgment on the merits, ECF No. 17, is before me for a report and recommendation under 28 U.S.C. § 636(b)(1)(B), ECF No. 39. Having considered the parties' pleadings, all supporting materials, and the applicable law, I respectfully recommend that the District Court grant in part and deny in part the motion.

---

[1] The Defendants submitted the 2012–2014 version of VDOC Operating Procedure 841.3 with their motion for summary judgment. *See generally* King Aff. Attach. B, ECF No 18-2. Defendant A. David Robinson has since issued an updated Operating Procedure 841.3. *See* Va. Dep't of Corr., Offender Religious Programs (July 1, 2015), https://vadoc.virginia.gov/about/procedures/documents/800/841-3.pdf. The policy at issue here was moved from subsection IV.A, "Access to Religious Services," to subsection IV.C, "Guidelines for Religious Group and Religious Holy Day/Season Participation." No changes relevant to this case were made. This report and recommendation cites to the policy that the Defendants submitted with their motion.

1

## I. Background[2]

A review of the relevant VDOC policies and procedures is necessary to give context to Snodgrass's claims. The VDOC accommodates Muslim inmates who observe Ramadan by serving their meals before sunrise and after sunset, which allows the inmates to fast during daylight hours.[3] *See generally* Va. Dep't of Corr. Operating Procedure 841.3 § IV.C.4(a)–(b), May 12, 2014, ECF No. 18-2; King Aff. Attach. A, May 9, 2013, ECF No. 18-2 ("Robinson Mem."). To participate in any holy day/season observance, however, an inmate's name must be

> on the master pass list at the time of the observance for one or more services within the designated religions that observe that holy day/season. Offenders [who are] not on the master pass list for services of the designated religions are ineligible to participate and shall be struck from the sign-up list.

841.3 § IV.A.3(a)–(b). To place their names on a group's master pass list, inmates must complete a Request to Attend Religious Services ("Request") identifying the "regular, ongoing religious services" they want "to attend within the religion of their choice." *Id.* § IV.A.1(b)(i)–(ii); *see also id.* § IV.A.1(c); Mathena Aff. ¶¶ 5–6; Mathena Interrog. Ans. 1, Dec. 11, 2014, ECF No. 35-2. Inmates who complete a Request have their names

> added to the appropriate pass list—i.e., for the regular, ongoing activities (weekly worship services, study groups, etc.) that have been specified on the Request. Until the next quarterly open enrollment period (or until institutional transfer), offenders may only attend the regular, ongoing religious services that they have designated on the Request.
>
> As long as the offender is assigned to that facility and active in the selected religious groups, they will remain on the master pass list for the selected religious groups until they submit a new Request (during an open enrollment period) to remove them from the pass list or change their selections.

---

[2] The following facts are not genuinely disputed. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

[3] At ROSP, for example, employees serve the morning Ramadan meal between 3:45 a.m. and 4:30 a.m., and the evening Ramadan meal between 9:00 p.m. and 10:00 p.m. *See* Mathena Aff. ¶¶ 4, 18, Aug. 26, 2014, ECF No. 18-1. Employees also must prepare and serve meals to "the hundreds of prisoners who do not participate in Ramadan," usually at 6:15 a.m. and 4:00 p.m. *Id.*

2

*Id.* § IV.A.1(b)(ii)–(iii).[4] These inmates also may participate in their selected religious group's holy day/season observances. *Id.* § IV.A.3(a).

Inmates who do not complete a Request cannot "attend regular, ongoing facility programs or services of any religion until after submitting a Request during the next open enrollment period." *Id.* § IV.A.1(c)–(d) ("Until such time, they may practice their faith privately/individually through prayer, meditation, reading, reflection, etc. The Request to Attend Religious Services shall not be used to approve or deny religious property or items, including religious literature."). These inmates' names would also be struck from any holy day/season observance's sign-up list because, absent submitting a Request, they will not be "on the master pass list . . . for one or more services within" any religious group, *id.* § IV.A.3(a), (b). *See id.* § IV.A.1(b); Mathena Aff. ¶¶ 5–6; Mathena Interrog. Ans. 1.

VDOC policy also allows "[e]ach facility [to] establish a consistent standard to determine if an offender is active in their selected religious group," 841.3 § IV.A.1(b)(iv), and to "remove[] from the master pass list" general-population inmates who are "deemed not active in their religious group,"[5] *id.* § IV.A.1(b)(iv)(c).

---

[4] VDOC officials use pass lists "to control and document participation in all religious services and programs" offered in their facilities. 841.3 § IV.C.3. "Pass lists" allow inmates to participate in specific religious activities, services, meetings, and holy day/season observances. *See id.* §§ IV.A.1(b), IV.C.3. "Master pass lists," on the other hand, keep track of which inmates are "active in the[ir] selected religious group." *Id.* § IV.A.1(b)(iii)–(iv); *see also* Mathena Interrog. Ans. 4 ("[T]he master pass list shows an offender's participation in religious services and demonstrates that the offender is attending such services."). Snodgrass challenges VDOC's policy requiring an inmate's name to be on a religious group's "master pass list" in order to participate in that religion's holy day/season observances. *See* Am. Compl. ¶ 36.

[5] "Offenders should not be removed from the master pass list because of temporary inactivity due to temporary transfer or assignment to special housing. If removed for such reason, the offender shall be allowed to submit a new Request to Attend Religious Services within the first 2 weeks after returning to general population." 841.3 § IV.A.1(b)(iii)(a)–(b); *see also Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir. 2011) (holding that a VDOC policy that required an inmate whose name was removed from a master pass list while he was in segregation to wait

3

This standard may be based on consecutive absences, percentage of services attended, etc., but it must be applied consistently to all offenders and all religious groups with allowance for events such as hospital admissions, assignment to special housing, temporary transfers for court appearances, etc.

The standard to determine whether an offender is active in their selected religious groups must be clearly stated on the facility's Request to Attend Religious Services.

Offenders who have been removed from the master pass list for inactivity may be added back to the master pass list for that group by submitting a new Request to Attend Religious Services at the next open enrollment period.

*Id.* § IV.A.1(b)(iv)(a)–(b), (d). In the meantime, though, these inmates "shall be" excluded from all holy day/season observances. *Id.* § IV.A.3(b).

Snodgrass is an inmate at ROSP in Pound, Virginia. Am. Compl. ¶ 3. In 2012 and 2013, the prison offered regular, ongoing services to inmates who identified as Catholic, Protestant, Jewish, Nation of Islam ("NOI"), or Sunni Muslim. *See* Compl. Attach. 4, ROSP Request to Attend Religious Servs. (rev. Mar. 1, 2012), ECF No. 2. The 2012–2013 version of ROSP's Request warns that "[o]ffenders who are assigned to Special Housing or [who] miss three (3) consecutive services of any selected Religious Group may be removed from the group's master pass list and not allowed to attend services until they submit a new Request to Attend Religious Services at the facility's next open enrollment period." *Id.* It does not indicate that inmates who do not regularly attend their chosen "group meet[ings]" also cannot participate in non-congregational holy day/season observances. *See id.*

Snodgrass is a Sunni Muslim. *See* Am. Compl. ¶ 10. His faith dictates that he fast from sunrise to sunset during Ramadan, the Muslim Holy Month of prayer and fasting. *See id.* ¶¶ 29, 31; Pl. Aff. ¶¶ 1–3, Jan. 14, 2014, ECF No. 38. At ROSP in 2012, Snodgrass received pre-sunrise and post-sunset meals simply by adding his name to the Ramadan sign-up list that was

_____

until the next quarterly open-enrollment period to submit a new Request "substantially burdened" the inmate's religious exercise).

4

posted in his general-population housing unit. Am. Compl. ¶ 9. He was not required to attend regular, ongoing services in order to receive this accommodation. Pl. Aff. ¶ 7.

In 2013, ROSP implemented a "new Ramadan policy" for inmates housed in general population. Mathena Interrog. Ans. 20. To participate in Ramadan that July, the inmate's name needed to be on the Sunni Muslim or NOI master pass list as of May 9, 2013, the date Robinson issued his annual Ramadan guidance memo.[6] King Aff. ¶¶ 5, 7. Inmates whose names were on either list "were provided with the information for participation" because, under 841.3 § IV.A.3(a), they were eligible to participate in Muslim holy day/season observances. King Aff. ¶ 5. Any inmate who signed up by June 3, 2013, was allowed to take his meals before sunrise and after sunset.[7] Mathena Aff. ¶ 12.

Inmates who were not on the Sunni or NOI master pass list as of May 9, 2013, were "not provided with the Ramadan information" because, under 841.3 § IV.A.3(b), they would have been struck from the sign-up list. King Aff. ¶ 7; *see also* Mathena Aff. ¶¶ 10–15. Counselor

---

[6] The memo informed wardens that many Muslim or NOI inmates would observe Ramadan/Month of Fasting from sunset on July 8, 2013, to sunset on August 7, 2013. *See* Robinson Mem. ¶ I.A. Robinson instructed each facility to create separate pass lists for Muslim inmates to sign up for Ramadan or Month of Fasting and the Eid-al-Fitr feast and reminded them that, "in accordance with Operating Procedure 841.3, only those offenders who are on the regular master pass list for Muslim . . . or NOI services are eligible to participate in Ramadan or Month of Fasting activities." *Id.* ¶¶ I.C, I.D, II.A. Robinson set the sign-up deadline for June 3, 2013, which gave facilities more than 30 days to prepare before serving the first morning meal on July 9, 2013. *Id.* ¶ I.C. He also allowed officials to add to the Ramadan/Month of Fasting pass lists inmates "arriving after the June 3 cut-off date . . . based on the following criteria: family history in the Muslim . . . or NOI faiths . . . , past involvement in Muslim . . . or NOI services at previous assignments, or past Ramadan/Month of Fasting involvement." *Id.* ¶ I.D.

[7] ROSP inmates housed in segregation could place their names on the 2013 Ramadan pass list simply by signing up in advance. *See* Mathena Aff. ¶¶ 11–12. Mathena and King did not enforce VDOC's master pass list policy against these inmates because they could not attend group religious services. *See id.* ¶¶ 6, 8, 12, 14, 16.

5

Jessie King notified "all offenders about the new Ramadan policy," Mathena Interrog. Ans. 20, on either June 4 or June 27, 2013. *See* King Interrog. Ans. 4, 15.

Snodgrass's name "was on the master pass list for . . . Sunni religious services until May 1, 2013."[8] King Aff. ¶ 6. His name was removed from the list on that date because he "missed more than three consecutive Sunni religious services." *Id.* "Because . . . Snodgrass was no longer on the Sunni master pass list, he was not eligible to participate in Ramadan 2013. And, because Snodgrass was no longer eligible to participate in Ramadan" when Robinson issued his memo, "he was not provided with the Ramadan information" before the sign-up deadline. *Id.* ¶ 7.

On June 16, 2013, Snodgrass told King that he observed Ramadan in 2012 and wanted to do so again in 2013 because it was "a critical element of [his] religion." Compl. Attach. 1, ECF No. 2. Snodgrass explained that he "was waiting for a memo" but "no notice was given [about] deadlines." *Id.* On June 26, 2013, King responded that

> only those offenders who have declared their religious affiliation as Muslim, Sunni, [or] Nation of Islam . . . will be permitted to participate in the Celebration of Ramadan this year. Per the memo dated May 9, 2013 from Chief of Operations A. David Robinson, only those offenders whose name appears on the regular master pass [list] for Muslim services are eligible to participate in Ramadan. This is in accordance with []OP 841.3.

*Id.* Snodgrass recalls telling King that "he ha[d] already been approved" to attend religious services. Am. Compl. ¶ 12.

---

[8] On March 24, 2013, Snodgrass submitted a Request to Attend Religious Services changing his religious affiliation from NOI to Sunni Muslim. *See* Am. Compl. ¶ 10; Compl. Attach. 4. More precisely, Snodgrass checked a box indicating that he wanted to attend Jumah, or Islamic congregational prayer, on Friday afternoons. Compl. Attach. 4. Snodgrass's Request was approved on April 16, 2013, and his name was added to both the Jumah pass list and the Sunni master pass list. Am. Compl. ¶¶ 11, 19; *see also* Def. Br. 6; King Aff. ¶ 6; Mathena Aff. ¶ 14; ROSP Jumah B Pass List, Apr. 26, 2013, ECF No. 35-3.

On July 4, 2013, Snodgrass submitted a regular grievance stating that he wanted to observe Ramadan as he had done in 2012. Compl. Attach. 2, ECF No. 2; Am. Compl. ¶ 15. Snodgrass also expressed concern that "no memo ha[d] been issued . . . stating that one has to be on the master pass list to participate in Ramadan" and that this requirement impermissibly "dictat[ed] how [he] must practice [his] religion." Compl. Attach. 2.

Warden Randall Mathena responded on July 15, 2013. *Id.* He explained that VDOC's master pass list policy limited "participation in holy day/season observances . . . to those offenders [who] are on the master pass list at the time of the observance for one or more services within the designated religions that observe that specific holy day/season." *Id.* "Therefore," Mathena concluded, "offenders [who] are not on the master pass list for services of the designated religions are ineligible to participate." *Id.* VDOC Regional Administrator George Hinkle denied Snodgrass's appeal on July 31, 2013. Compl. Attach. 3, ECF No. 2.

Having exhausted his administrative remedies, Snodgrass filed this lawsuit under 42 U.S.C. §§ 1983 and 2000cc-1, alleging that Robinson, Mathena, King, and Hinkle violated his rights under RLUIPA, the First Amendment, and the Fourteenth Amendment. *See* Am. Compl. ¶¶ 4–7, 19–26, 28, 30–32, 36. He alleges that VDOC's master pass list policy—as issued by Robinson and as applied by Mathena, King, and Hinkle—violates RLUIPA and the Free Exercise Clause because it requires inmates to attend ongoing group services in order to participate in non-congregational holy day/season observances. *See generally id.* ¶¶ 24, 29, 31, 32, 36. Snodgrass also alleges that Mathena, King, and Hinkle violated his Fourteenth Amendment rights to procedural due process and equal protection when they refused his requests to observe the Ramadan fast. *See id.* ¶ 28(B), (C), (E). He seeks declaratory relief; prospective

7

injunctive relief; and compensatory, nominal, and punitive damages against each Defendant in his or her official and individual capacities. *See id*. ¶¶ 8, 35–39.

In September 2014, the Defendants moved for summary judgment on qualified-immunity grounds and on the merits of most of Snodgrass's claims for relief.[9] *See generally* Def. Br. 8–20, 22–23, ECF No. 18. The District Court denied summary judgment on qualified-immunity grounds, but took the motion for summary judgment on the merits under advisement pending discovery. *Snodgrass v. Robinson*, No. 7:14cv269, 2014 WL 6472847, at *2 (W.D. Va. Nov. 18, 2014) (Conrad, C.J.). The motion is ripe for review.

## II. Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014) (per curiam). Facts are material when they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists if "a reasonable jury could return a verdict in favor of the nonmoving party." *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va. 2014), by "pointing out to the district court . . . an absence of evidence to support the nonmoving

---

[9] The Defendants' motion asks the Court to grant summary judgment "for the reasons set forth" in their brief. ECF No. 17. The brief "identif[ies] each claim" for relief against each Defendant, Fed. R. Civ. P. 56(a), except for the Free Exercise Clause claims for declaratory and injunctive relief against Robinson in his official capacity and the Free Exercise Clause claim for damages against Robinson in his individual capacity. *See generally* Def. Br. 7, 8–12, 14–15, 16–17, 20, 20–21. Accordingly, the Court will not address whether Robinson is entitled to summary judgment on these claims. *See* Fed. R. Civ. P. 56(f)(2).

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 8 of 33   Pageid#: 274

party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party makes that showing, the nonmoving party must then produce sufficient admissible evidence to establish a specific material fact genuinely in dispute. *See* Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When deciding a summary-judgment motion, the court must accept well-pled factual allegations as true and draw all reasonable inferences in the nonmoving party's favor. *See* Fed. R. Civ. P. 56(c)(3); *Tolan*, 134 S. Ct. at 1866; *Scott*, 550 U.S. at 380. The court does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the evidence reveals a genuine issue of material fact for trial. *See Tolan*, 134 S. Ct. at 1866; *Scott*, 550 U.S. at 380–81.

### III. Discussion

A.    *RLUIPA*

"RLUIPA prohibits prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means." *Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir. 2011) (citing 42 U.S.C. § 2000cc-1(a)). The statute creates a cause of action for equitable relief against any "person acting under color of State law" who imposes a substantial burden on the plaintiff's religious exercise, "even if the burden results from a rule of general applicability."[10] *See* 42 U.S.C. §§ 2000cc-1(a) -2(a), -5(4). "If a plaintiff produces prima facie

---

[10] Snodgrass alleges a cause of action against the Defendant prison officials under RLUIPA's spending-clause provision, 42 U.S.C. § 2000cc-1(b)(1). *See* Am. Compl. ¶¶ 21, 28(D). This provision neither creates a cause of action against state officials sued in their individual capacities nor authorizes damages against state officials sued in their official capacities. *See Sossamon v. Texas*, --- U.S. ---, 131 S. Ct. 1651, 1658–60 (2011) (official-capacity claims); *Rendleman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (individual-capacity claims). Therefore, I recommend that the District Court **GRANT** the motion for summary judgment on Snodgrass's

evidence to support a claim alleging a violation of [RLUIPA] . . . the government shall bear the burden of persuasion on any element of the claim[] except" whether the challenged policy "substantially burdens the plaintiff's exercise of religion." *Id.* § 2000cc-2(b); *see Jehovah v. Clarke*, --- F.3d ---, No. 13-7529, 2015 WL 4126391, at *4 (4th Cir. July 9, 2015).

Snodgrass must first show that VDOC's master pass list "policy implicates his religious exercise" and that his request for an exemption was "sincerely based on a religious belief." *Holt v. Hobbs*, --- U.S. ---, 135 S. Ct. 853, 862 (2015). Snodgrass's alleges that this policy—as written and as applied—"hindered" his ability to fast during Ramadan because it made him ineligible for pre-sunrise and post-sunset meal service. *See* Am. Compl. ¶¶ 25, 29, 31. The Defendants agree that fasting during Ramadan is a religious exercise, and they "assume without conceding" that Snodgrass's request to do so in 2013 was sincerely based a religious belief. Def. Br. 9. The Court considers both material facts undisputed. Fed. R. Civ. P. 56(e)(2).

Next, Snodgrass must show that VDOC's master pass list policy "substantially burdened" his ability to fast during Ramadan. *Holt*, 135 S. Ct. at 862. Under RLUIPA, "a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Substantial pressure "directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forgo religious precepts or from pressure that mandates religious

---

claims for damages under RLUIPA against all defendants, Def. Br. 20. *See Blount v. Phipps*, No. 7:11cv594, 2013 WL 831684, at *2 (W.D. Va. Mar. 6, 2013) (Conrad, C.J.). Snodgrass may still seek declaratory and injunctive relief under RLUIPA against the Defendants in their official capacities. Am. Compl. ¶¶ 4–8, 28(D), 35–36.

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 10 of 33   Pageid#: 276

conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *accord Lovelace*, 472 F.3d at 187 (citing *Midrash Sephardi*, 366 F.3d at 1227).

The Defendants argue that Snodgrass "has not alleged that, during his non-participation in Ramadan, he modified his behavior and, as a result violated his religious beliefs."[11] Def. Br. 9. I disagree. Snodgrass alleges that he could not "observe[] . . . Ramadan, which is [the] Islamic Holy Month of fasting and prayer." Am. Compl. ¶ 19; *see also id.* ¶¶ 12–13, 18, 29 (alleging that he could not "participate in" Ramadan). More importantly, Snodgrass has produced undisputed evidence that King and Mathena refused his requests to participate in Ramadan 2013 because his name was not on the Sunni Muslim master pass list. Compl. Attachs. 1–3; Pl. Aff. ¶¶ 4–8; *see also* Mathena Aff. ¶¶ 4, 14, 16, 18; King ¶¶ 6–7.

At ROSP, "participating in" Ramadan simply means that an inmate receives his meals before sunrise and after sunset, which allows him to fast during daylight hours. Mathena Aff. ¶¶ 4, 18. The Defendants concede that Snodgrass "was not permitted to participate in Ramadan 2013." Mathena Aff. ¶ 16. "Unable to fast, [Snodgrass] could not fulfill one of the five pillars or obligations of Islam" unless he also went without regular meals for a month. *Lovelace*, 472 F.3d at 186; *see also* Am. Compl. ¶ 29 ("Ramadan-Month of Fasting [is] one of Islam's five fundamental principles."); *id.* ¶ 31 ("[T]here [were] no other means for [Snodgrass] to observe

---

[11] The Defendants also argue that the master pass list policy did not "substantially burden" Snodgrass's religious exercise because he "had access to religious material and property" and could "participate in weekly religious services" even though he "was not permitted to participate in Ramadan in 2013." Def. Br. 9; Mathena Aff. ¶ 16. This argument "misunderst[ands] the analysis that RLUIPA demands." *Holt*, 135 S. Ct. at 862. The "availability of alternative means of practicing religion is a relevant consideration" under the Free Exercise Clause, "but RLUIPA provides greater protection" than the First Amendment. *Id.* "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened the religious exercise [in question], not whether the [plaintiff] is able to engage in other forms of religious exercise." *Id.* The only religious exercise in question here is Snodgrass's ability to fast from sunrise to sunset during Ramadan. *See* Am. Compl. ¶¶ 18, 20, 29, 31.

his obligatory religious observance."). Thus, applying the master pass list policy so as to exclude Snodgrass from ROSP's Ramadan meal service substantially burdened his religious exercise. *Cf. Lovelace*, 472 F.3d at 189 ("Lovelace's removal from the Ramadan observance pass list . . . qualifies as a substantial burden under RLUIPA.").

Further, an "inmate's right to religious exercise is substantially burdened by a policy . . . that automatically assumes that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others," *Lovelace*, 472 F.3d at 186, or that otherwise "mandates religious conduct," *Midrash Sephardi*, 366 F.3d at 1227. In *Lovelace*, for example, the Fourth Circuit held that a policy excluding Muslim inmates from congregational prayers if they broke the Ramadan fast substantially burdened Lovelace's religious exercise because it automatically assumed that his decision "not to be religious about fasting" meant that he was not "religious about other practices, such as . . . group prayer." 472 F.3d at 187.

This case is *Lovelace*'s mirror image: Snodgrass says that he is religious about fasting, but not about Friday congregational prayers. *See* Am. Compl. ¶¶ 29, 31; Pl. Aff. ¶¶ 2, 4, 7–8. Yet, Mathena admits that ROSP officials used Snodgrass's "regular attendance" at the latter as "the determinative factor" in rejecting his requests to observe the former. Mathena Aff. ¶ 20. Although prison officials must determine which inmates are "entitled to accommodations" during Ramadan, "it exceeds their authority to decide which, if any, religious [practices] are sufficiently important as to constitute an appropriate gauge of faith" generally. *Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014). Viewed in Snodgrass's favor, the evidence shows that VDOC's master pass list policy, as applied by Mathena and King to Snodgrass in 2013,

substantially burdened Snodgrass's sincere religious beliefs.[12] *See Lovelace*, 472 F.3d at 186, 188.

Snodgrass's argument that VDOC's master pass list policy on its face substantially burdens religious exercise presents a closer question. *Cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in all of its applications."). Read in isolation, the language restricting holy day/season observances to inmates who "are on the master pass list . . . for one or more services within the designated religions that observe th[e] holy day/season," 841.3 § IV.A.3(a), might allow "prison officials to appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). For inmates who regularly attend congregational religious services, this requirement would not present a barrier to observing other religious practices.

The problem, however, is that the VDOC policy as a whole is "arranged and written so that disqualification from participation in one religious practice" automatically bars inmates' participation in their religion's holy day/season observances, *Lovelace*, 472 F.3d at 189 (finding that such a policy on its face "substantially burdened" the inmate's religious exercise). *See, e.g.*, 841.3 §§ IV.A.1(b)(iii)–(iv), IV.A.1(c), IV.A.3(a)–(b); *see also* Mathena Aff. ¶¶ 6, 8, 12, 20

---

[12] The evidence does not support Snodgrass's RLUIPA claim against Hinkle, however. Hinkle's "involvement in the Ramadan [pass list] matter was limited to affirming the denial of [Snodgrass's] grievance. Generally, prison officials are absolutely immune from liability stemming from their participation in the inmate grievance process." *Blount*, 2013 WL 831684, at *5 n.12 (citing *Burst v. Mitchell*, 589 F. Supp. 186, 192 (E.D. Va. 1984)) (analyzing a similar claim brought under 42 U.S.C. § 1983); *see also Lowery v. Edmonson*, 528 F. App'x 789, 792 (10th Cir. 2013) (noting that "the mere denial of a grievance . . . is inadequate" to support an inmate's cause of action against a prison official under RLUIPA). Therefore, I recommend that the District Court **GRANT** Hinkle's motion for summary judgment on this claim, Def. Br. 20–21.

13

(explaining the VDOC policy's effect on inmates' ability to participate in holy day/season observances). For example, an inmate can only put his name on a master pass list by submitting a Request to Attend Religious Services. *See* 841.3 § IV.A.1(c); Mathena Interrog. Ans. 1; Mathena Aff. ¶ 5. The Request only allows inmates to identify the "regular, ongoing activities" and religious services they want to attend. 841.3 § IV.A.1(b)(i)–(ii). It does not list recognized holy day/season observances or "religious preferences" generally. *See, e.g.*, *id.* Attach. 1. Thus, an inmate who does not submit a Request—perhaps because he does not want to attend group worship—is automatically barred from his religion's holy day/season observances. *See id.* §§ IV.A.1(c), IV.A.3(b). The master pass list policy itself contains no exceptions for inmates who have "expressed [their] religious preferences," Mathena Aff. ¶ 7, in other relevant ways. *See* 841.3 § IV.A.3(a)–(b).

The VDOC policy also expressly authorizes prison officials to "mandate[] religious conduct," *Midrash Sephardi*, 366 F.3d at 1227, and to decide which "religious [practices] are sufficiently important as to constitute an appropriate gauge of faith," *Wall*, 741 F.3d at 499. For example, officials may "remove[] from the master pass list" any general-population inmate who is "deemed not active" in his religious group. 841.3 § IV.A.1(b)(iv). Although the policy instructs that the "standard *may* be based on consecutive absences [or] percentage of services attended," *id.* (emphasis added), it makes clear that officials should apply the removal standard by tracking inmates' attendance at "the regular, ongoing activities (weekly worship services, study groups, etc.) that they have specified on the Request." *Id.* § IV.A.1(b)(ii)–(iii).

Thus, "the policy works to restrict the religious exercise" of inmates who want to participate in their religion's holy day/season observances, but who do not want to attend regular, ongoing group services. *Lovelace*, 472 F.3d at 188. Viewing the record in Snodgrass's favor, a

14

reasonable factfinder could conclude that VDOC's master pass list policy on its face substantially burdens inmates' religious exercise. *See id.* at 183, 193; *accord Midrash Sephardi*, 366 F.3d at 1227.

The burden now shifts to the Defendants to prove that this policy—both as issued by Robinson and as applied by Mathena and King—is "the least restrictive means of furthering a compelling governmental interest." *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (citing 42 U.S.C. § 2000cc-1(a)). The Defendants are entitled to summary judgment only "if the proffered evidence is such that a rational factfinder could only find for the government" on both elements. *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009) (citing *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992) ("[W]here . . . the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly heavy one.")).

 As to Snodgrass's facial challenge, the Defendants must show that effectively requiring inmates to attend regular, ongoing religious activities in order to participate in holy day/season observances, 841.3 §§ IV.A.1(b)–(c), IV.A.3(a)–(b), is the least restrictive means of furthering a compelling governmental interest. *See Lovelace*, 472 F.3d at 189–90. As to Snodgrass's as-applied challenge, the Defendants must both "explain why [they] denied" Snodgrass's request for an exemption and "prove that denying the exemption [was] the least restrictive means of furthering a compelling governmental interest." *Holt*, 135 S. Ct. at 864.

Context matters when applying the compelling-interest standard. *See Cutter*, 544 U.S. at 723. Although courts should not "mechanically accept" prison administrators' rationale for restricting religious exercise, *Lovelace*, 472 F.3d at 190, they must give "due deference to the experience and expertise of prison . . . administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs

15

and limited resources," *Cutter*, 544 U.S. at 723. *See Holt*, 135 S. Ct. at 864. The "least-restrictive-means standard," on the other hand, "is exceptionally demanding." *Id.* "It requires the [G]overnment to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* (alterations and citations omitted).

The Defendants rely exclusively on Warden Mathena's affidavit to show that VDOC's master pass list policy, as written and as applied to Snodgrass, is the least restrictive means of furthering VDOC's and ROSP's compelling interests in controlling costs, minimizing disruption, and maintaining order and security during holy day/season observances. *See generally* Def. Br. 10–12. Mathena explains that "[m]aintaining a master pass list for the various recognized religions promotes institutional order" and helps prison officials "keep[] track of which offenders have expressed religious preference(s)." Mathena Aff. ¶ 7. "Without a master pass list," he concludes, prison officials could not "readily ascertain which offenders adhere to which religious principles and practices." *Id.*

Keeping a master list of inmates' "expressed religious preferences"—without more—certainly would further a prison's compelling interest in maintaining institutional order. But Snodgrass does not challenge that aspect of VDOC's master pass list policy. He challenges the "policy's strict (and broad) removal provision," *Lovelace*, 472 F.3d at 189, that automatically excludes inmates from holy day/season observances if they do not regularly attend at least one "regular, ongoing" congregational service offered to that religion's adherents. *See* Am. Compl. ¶ 36; 841 § IV.A.3(b). Mathena recognizes as much:

> Without a master pass list some of these offenders might 'fall through the cracks,'
> in that if [VDOC] did not track whether an offender had expressed a religious

16

preference *and had been regularly attending religious services*, institutional authorities might inadvertently deny that offender the right to participate in a religious service or practice that the offender would otherwise be entitled to observe. Conversely, if [VDOC] did not attempt to verify whether an offender had expressed a religious preference *and had been regularly attending religious services*, offenders who did not possess sincerely held religious beliefs would attempt to participate in the religious holidays and observances out of boredom, spite, or for other, non-religious reasons.

* * *

Having offenders who want to participate in Ramadan sign up prior to the scheduled fast is the most efficient, least restrictive manner of ensuring that the participating offenders do so for religious reasons. Using the master pass list as the determinative factor in approving offenders for Ramadan is the simplest way of ensuring that the Ramadan participants are 'true' Muslims. . . . The master pass list policy, then, simply ensures that the offenders with an expressed religious belief *attend religious services on a regular basis*, and then uses that as the measuring stick for religious sincerity.

Mathena Aff. ¶¶ 8, 20 (emphasis added). But Mathena does not explain why requiring general-population inmates to "attend religious services on a regular basis," *id.* ¶ 20, to even sign up for holy day/season observances, 841.3 § IV.A.3(b), is the least restrictive means of furthering VDOC's compelling interest in maintaining institutional order. Thus, the proffered evidence cannot compel the conclusion that VDOC's master pass list policy itself comports with RLUIPA as a matter of law. *See Lovelace*, 472 F.3d at 190–92.

Mathena's affidavit fares no better against Snodgrass's as-applied challenge. On this claim, the Defendants must "explain why [they] denied" Snodgrass's request for an exemption to the master pass list policy and "prove that denying the exemption [was] the least restrictive means of furthering a compelling governmental interest." *Holt*, 135 S. Ct. at 864. Mathena contends that there is an "incremental cost" to accommodating each inmate who observes Ramadan because ROSP must specially order meals, modify staff and meal schedules, and deliver a nighttime snack to each participating inmate's cell. *See generally* Mathena Aff. ¶¶ 17–20. "If there were no procedure and requirements in place for participating in Ramadan," Mathena explains, "many of the offenders would say they want to sign up for Ramadan just to

17

vary their meal times, [to] eat from a different menu, and to manipulate staff and the system." *Id.* ¶ 19. "Obviously[] expenses will increase if [ROSP] experiences many prisoners taking advantage of a relaxed Ramadan meal policy to get extra meals," he concludes. *Id.*

The Court certainly understands ROSP's interest in controlling costs generally and in administering particular religious programs. *See Coleman v. Jabe*, No. 7:11cv518, 2013 WL 4084762, at *3 (W.D. Va. Aug. 13, 2013) ("Prison cost control is . . . a compelling state interest."). But, again, Snodgrass does not argue that RLUIPA bars *all* procedural hurdles to Ramadan participation. *See, e.g.*, Am. Compl. ¶ 36. The question in this case is whether ROSP's *specific* hurdle to Snodgrass's participation—i.e., requiring him to attend religious services on a regular basis—necessarily furthers the prison's compelling interest in controlling Ramadan-related costs. *Cf. Wall*, 741 F.3d at 499 ("Accepting that prisons may limit religious accommodations to sincere believers, the question in this case is whether ROSP's specific means of testing Wall's sincerity was permissible; that is whether ROSP was allowed to require him to possess specific[] physical items of Islamic faith as proof of belief.").

Mathena's affidavit contains no "specific information [about] these purported costs," *id.* at 501, and the Court cannot sustain ROSP's strict application of the master pass list policy as a means of furthering such "broadly formulated interest[s]," *Holt*, 135 S. Ct. at 863. RLUIPA "contemplates a more focused inquiry [that] requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged [policy] to the person— the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. at 863. Mathena's affidavit offers no specific information on this point. *See generally* Mathena Aff. ¶¶ 8–9, 14–15, 19–20.

18

Nor does Mathena try to explain why denying Snodgrass's request for an exemption was the least restrictive means of furthering a compelling governmental interest. Instead, he says that "using the master pass list . . . is the *simplest* way" to control costs because it "does not require extensive paperwork, or an interview," or a religious test. Mathena Aff. ¶ 20 (emphasis added). Mathena also explains that the master pass list policy "is easily applied" because it considers only whether general-population inmates "attended religious services on a regular basis" and then uses that criterion as "the determinative factor in approving"—or in Snodgrass's case, rejecting—their "participation in Ramadan." *Id.*

The least-restrictive-means standard is considerably more demanding. *Holt*, 135 S. Ct. at 864. It requires the Government to "sho[w] that it lack[ed] other means of achieving its desired goal without imposing a substantial burden on" Snodgrass's ability to observe Ramadan even though his name was not on the Sunni master pass list. *Id.* Mathena does not suggest that ROSP lacked such alternatives in this case. *See* Mathena Aff. ¶¶ 14–15, 19–20.

Moreover, the Defendants own exhibits reveal that other, less restrictive means may have been available to ROSP officials in 2013. Inmates housed in segregation and newly-arrived inmates could receive Ramadan meals even though, for differing reasons, they could not attend or had not attended group worship. *See* Mathena Aff. ¶ 12; Robinson Mem. ¶ I.D. For these inmates, officials at ROSP apparently were able to assess their sincerity without resorting to the single criterion of regular attendance at group services. Inmates housed in segregation could participate in Ramadan simply by signing up by the June 3 deadline, Mathena Aff. ¶ 12; *see also id.* ¶ 6 ("[O]ffenders assigned to special housing are not barred from being members of a certain religion simply because of their inability to regularly attend religious services."), but the record does not reveal what criteria ROSP officials used to assess their sincerity. Newly-arrived inmates

19

could demonstrate their sincerity based on their past participation in Ramadan. Robinson Mem. ¶ I.D.

Mathena does not explain why using similar criteria to assess Snodgrass's sincerity would not have achieved ROSP's interests. *Cf. Wall*, 741 F.3d at 501 (finding that using an inmate's past involvement in Ramadan could provide a less restrictive criterion). "At the very least, the government must acknowledge and give some consideration to less restrictive alternatives." *Jehovah*, 2015 WL 4126391, at *4. The Defendants have failed to show that they met this requirement. Accordingly, I recommend that the District Court **DENY** the motion for summary judgment on the merits of Snodgrass's RLUIPA claim for declaratory and injunctive relief against Robinson, Mathena, and King in their official capacities.

B.      *Free Exercise Clause*

The Free Exercise Clause "forbids the adoption of laws designed to suppress religious beliefs or practices." *Wall*, 741 F.3d at 499. This prohibition encompasses policies, like the one in this case, "that impose a substantial burden on a prisoner's right to practice his religion." *Id.* However, a neutral and generally applicable policy that substantially burdens an inmate's sincere religious exercise is constitutional if it is "reasonably adapted to achieving a legitimate penological" interest. *Id.* At trial, Snodgrass would bear the burden of proving that VDOC's master pass list policy, as written and as applied to him, is not reasonably adapted to achieving a legitimate penological interest. *Jehovah*, 2015 WL 4126391, at *3 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

The Defendants have moved for summary judgment on the merits of Snodgrass's claim that the policy was unconstitutional as applied.[13] *See* Def. Br. 14–15. This claim alleges that King, Mathena, and Hinkle refused to let Snodgrass participate in Ramadan 2013 "simply" because his name was not on the Sunni Muslim master pass list. *See generally* Am. Compl. ¶¶ 9–16, 19–20, 25–26, 36; Compl. Attachs. 1–4. More precisely, it challenges Mathena and King's decision in 2013 to use Snodgrass's non-attendance at Jumah "as the determinative factor" in rejecting his request to observe the Ramadan fast.[14] *See generally* Am. Compl. ¶¶ 29, 31; Pl. Aff. ¶ 7 ("Prior to 2013-Ramadan, I never was required to attend Jumah services to observe Ramadan. This was so at ROSP [for] 2012 Ramadan[.]").

The Defendants argue that their application of this policy was reasonably related to ROSP's interests in controlling Ramadan-related costs, minimizing disruption, and maintaining order and security. Def. Br. 11, 14. Mathena and King's refusal to grant Snodgrass's request for an exemption from that policy was "reasonable and thus permissible if it satisfies the four factors outlined in *Turner v. Safley*, 482 U.S. 78 (1987)." *Wall*, 741 F.3d at 499. That test asks:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right remain open to prison inmates"; (3) what impact the

---

[13] Robinson did not move for summary judgment on the merits of Snodgrass's claim that the VDOC policy that bears his signature is unconstitutional on its face. *See* Def. Br. 14–15.

[14] Even liberally construed, Snodgrass's allegations do not state a claim against Hinkle under 42 U.S.C. § 1983. Again, Hinkle's "involvement in the Ramadan [pass list] matter was limited to affirming the denial of [Snodgrass's] grievance. Generally, prison officials are absolutely immune from liability stemming from their participation in the inmate grievance process." *Blount*, 2013 WL 831684, at *5 n.12. Therefore, I recommend that the District Court **GRANT** Hinkle's motion for summary judgment on this claim, Def. Br. 20–21. *See id.*

I also recommend that the District Court **GRANT** the motion for summary judgment on Snodgrass's claim for damages against Robinson, Mathena, and King in their official capacities, Def. Br. 7. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that state actors sued in their official capacities under 42 U.S.C. § 1983 are immune from damages).

desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Lovelace*, 472 F.3d at 200 (quoting *Turner*, 482 U.S. at 89–92) (internal brackets omitted).

"Accepting that prisons may limit religious accommodations to sincere believers, the question in this case is whether ROSP's specific means of testing [Snodgrass's] sincerity was permissible; that is whether ROSP was allowed to require him to [regularly attend Jumah] as proof of belief." *Wall*, 741 F.3d at 499. On this record, I cannot find that the ROSP officials are entitled to judgment as a matter of law. *See id.* at 499–502.

Indeed, the policy that they applied to Snodgrass in 2013 is substantially similar to the policy that the Fourth Circuit questioned in *Wall*. Before 2010 "Muslim inmates at ROSP simply had to sign up to participate in Ramadan. In 2009, approximately half of the inmate population signed up. ROSP staff later determined that a significant number of the participating inmates were not, in fact, practicing Muslims." *Id.* at 494; *accord* Mathena Aff. ¶ 9 (describing the same). In 2010, any ROSP inmate who signed up for Ramadan also "had to provide some physical indicia of Islamic faith," such as a Quran or prayer rug. *Wall*, 741 F.3d at 494. "[I]nmates who did not have such materials or refused to acquire them were deemed insincere in their religious beliefs and were prohibited from participating in Ramadan" that year. *Id.*

Wall signed up to participate, but he could not produce any physical indicia of his Islamic faith because his belongings had been lost when he was moved to ROSP. *See id.* at 495. Instead, Wall produced a document showing that he received "common fare meals in accordance with his faith, and he informed the officers that he had observed Ramadan in 2008 and 2009." *Id.* An ROSP official told Wall, "that don't mean anything" and instructed two other officials to remove Wall's name from the Ramadan sign-up list. *Id.* ROSP officials summarily rejected Wall's

22

attempts to put his name back on the list because he "[e]ither had no religious material or refused to present [the] material" as required by that year's Ramadan participation policy. *Id.*

Viewing the record in Wall's favor, the Fourth Circuit held that a reasonable factfinder could conclude that ROSP's exclusive reliance "on a narrow set of parameters while ignoring obvious indications" of Wall's sincere desire to observe Ramadan was unconstitutional. *Id.* at 501–02. The panel's reasoning, which "restricts prisons from requiring specific . . . indicia of faith in the face of significant alternative evidence that an inmate's religious beliefs are sincere," *id.* at 501, carries equal force in Snodgrass's case. *See also id.* at 502 n.15 ("[P]rison officials may not turn a blind eye to obvious justifications for exceptions [to bright-line rules] when they present themselves so plainly.").

On June 16, 2013, Snodgrass told King that he observed Ramadan in 2012 and wanted to do so again because the fast "is a critical element of [his] religion." Compl. Attach. 1. By that time, King had removed Snodgrass's name from the Sunni master pass list because, she contended, he missed at least three consecutive Jumah. King Aff. ¶ 6; King Interrog. Ans. 3, 5. King concedes that Snodgrass "was not provided with the Ramadan information" because, once off the Sunni master pass list, King Aff. ¶ 6, Snodgrass was "no longer eligible to participate in Ramadan," *id.* ¶ 7. King remained steadfast even though she knew that Snodgrass participated in Ramadan at ROSP in 2012. Compl. Attach. 1; Pl. Aff. ¶¶ 4, 8; *see also* Am. Compl. ¶¶ 12–13. As in *Wall*, Snodgrass "continued to pursue the issue after his initial denial, filing several grievances and requesting to be placed" on the 2013 Ramadan pass list. 741 F.3d at 500. But King and Mathena "rejected these requests and simply reiterated their policy without further consideration of [Snodgrass's] circumstances." *Id.*; *see* Compl. Attachs. 1–2.

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 23 of 33   Pageid#: 289

On this record, a reasonable factfinder could conclude that the ROSP officials "prohibited [Snodgrass] from observing the fast solely because he did not" attend Jumah. *Wall*, 741 F.3d at 500. Demanding attendance at specific congregational services, much like "demanding specific physical items as proof of faith[,] will rarely be an acceptable means of achieving the prison's stated interest in reducing costs." *Id.* at 499. Although ROSP officials could decide whether Snodgrass was "entitled to [Ramadan] accommodations, it exceed[ed] their authority to decide which, if any, religious [observances] are sufficiently important as to constitute [the] appropriate gauge of faith." *Id.* (citing *Lovelace*, 472 F.3d at 188). By applying VDOC's master pass list "policy in so rigid a manner, the restriction lost whatever valid, rational connection to [ROSP's] stated interest that might have existed at the time it was adopted." *Id.* The Defendants "may not condition [Snodgrass's] constitutionally protected rights on so narrow a set of grounds without 'render[ing] the policy arbitrary or irrational.'" *Id.* (quoting *Turner*, 482 U.S. at 89–90).

The remaining *Turner* factors—which the Defendants do not address in their brief—also support Snodgrass's claim that the master pass list policy was unconstitutional as applied. For example, "[i]t is clear that [Snodgrass] was absolutely precluded from observing Ramadan because of the [ROSP] defendants' actions," *Wall*, 741 F.3d at 501. *See, e.g.*, Compl. Attachs. 1–4; King Aff. ¶¶ 6–7; King Interrog. Ans. 3, 5. Asking whether "all forms of religious exercise" were available to Snodgrass "is unduly restrictive" in this case because "Ramadan, unlike Jumah, is one of the five pillars of Islam." *Wall*, 741 F.3d at 501 n.14; *see also* Pl. Br. in Opp. 5–6 (same). Snodgrass also had "a clearly established right to a diet consistent with his religious scruples, including proper food during Ramadan" when Mathena and King implemented ROSP's policy and enforced it against him. *Wall*, 741 F.3d at 501 n.14 (ellipsis omitted) (citing *Lovelace*, 472 F.3d at 198–99); *see also Snodgrass*, 2014 WL 6472847, at *2.

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 24 of 33   Pageid#: 290

The third *Turner* factor, "which examines the impact the requested accommodations would have on the prison's efficient operation, also supports [Snodgrass's] claim." *Wall*, 741 at 501. As in *Wall*, the Defendants in this case have not produced any specific information supporting their general contention that Ramadan is expensive and disruptive. *See* Mathena Aff. ¶ 17. The court cannot permit prison officials to deny Snodgrass's "constitutional right in the face of such generalized concerns. This is especially so in light of the negligible costs associated with adding one additional inmate to an already existent program."[15] *Wall*, 741 F.3d at 501.

Finally, there were "easy and obvious alternatives" to demanding Snodgrass's regular attendance at Jumah as proof of his sincere desire to observe Ramadan. *Wall*, 741 F.3d at 501. For example, Robinson's May 9, 2013, memo expressly authorized wardens to accommodate any Muslim inmate arriving at a new facility after the June 3 sign-up deadline if the inmate observed Ramadan in the past. Robinson Mem. ¶ I.D. King and Mathena "could have utilized the same, less restrictive criterion for determining [Snodgrass's] eligibility." *Wall*, 741 F.3d at 501; *see* Pl. Aff. ¶¶ 2, 4, 7–8 (asserting that Snodgrass observed Ramadan in 2009 and 2012 while incarcerated); Compl. Attach. 1–3 (asserting that Snodgrass observed Ramadan in 2012 at ROSP); Pl. Br. in Opp. 7 ("Plaintiff observed Ramadan in 2008 at Powhatan, [in] 2009 at Wallens Ridge, and [in] 2012 at Red Onion.").

"[V]iewing the current record in a light most favorable to [Snodgrass], the defendants' application of the [2013] Ramadan policy to [Snodgrass] was unconstitutional. The defendants relied exclusively on a narrow set of parameters while ignoring obvious indications of the sincerity of [Snodgrass's] beliefs. The First Amendment demands a more reasoned approach,

---

[15] Indeed, Mathena admits that ROSP does not enforce the master pass list policy against roughly one-half of its inmate population because the prison allows inmates who are in segregated housing to take Ramadan meals even though they cannot satisfy the dispositive criteria applied to Snodgrass of attending congregational services. *See* Mathena Aff. ¶¶ 6, 8, 12.

25

even within the difficult confines of a prison environment." *Wall*, 741 F.3d at 501–02. Accordingly, I recommend that the District Court **DENY** the motion for summary judgment on the merits of Snodgrass's Free Exercise claims for declaratory and injunctive relief against Mathena and King in their official capacities.[16]

To hold Mathena or King personally liable under section 1983, Snodgrass also must show that he or she acted with the requisite intent. *See Lovelace*, 742 F.3d at 201–02 ("[N]egligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause."). The Defendants do not seriously argue that Snodgrass cannot support this aspect of his Free Exercise claim. *See generally* Def. Br. 14–15. Nonetheless, Snodgrass has produced evidence indicating that Mathena and King intentionally interfered with his ability to observe Ramadan in 2013. *See, e.g.*, Compl. Attachs. 1–2, 4; Pl. Aff. ¶¶ 2–8.

For example, a reasonable factfinder could conclude that Mathena decided to use inmates' regular attendance at group services as "the determinative factor" in approving or rejecting their participation in the 2013 Ramadan fast, Mathena Aff. ¶ 20, and that King personally removed Snodgrass's name from the Sunni master pass list because she determined that Snodgrass "missed more than three consecutive Sunni religious services," King. Aff. ¶ 6. *See also* King Aff. ¶¶ 6–7; King Interrog. Ans. No. 5. It is also reasonable to infer that King intentionally did not give Snodgrass information about Ramadan before the June 3, 2013, sign-up deadline because she personally determined that he was ineligible to participate that year. *See* King Aff. ¶¶ 6–7.

---

[16] However, I recommend that the District Court **GRANT** the motion on Snodgrass's claim for damages against Robinson, Mathena, and King in their official capacities, Def. Br. 7. *See Will*, 491 U.S. at 71.

Accordingly, I recommend that the District Court **DENY** the motion for summary judgment on the merits of Snodgrass's Free Exercise claims for damages against Mathena and King in their individual capacities.

C.      Due Process

Snodgrass also alleges that the Defendants violated his Fourteenth Amendment right to procedural due process. Am. Compl. ¶ 28(C). "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978); *see also Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990) (noting that a claim is not actionable under § 1983 "unless and until" the State deprives the person of his protected interest without due process). Thus, due process "is a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

In most cases, the State must provide "notice reasonably calculated, under all the circumstances, to apprise" a person of an impending deprivation, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and an "opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). *See Dusenberry v. United States*, 534 U.S. 161, 167–68 (2002). Determining whether the plaintiff had "a meaningful opportunity to present [his] case" against deprivation, *Mathews*, 424 U.S. at 349, requires the court to balance (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the existing procedures and the probable value, if any, of

27

alternative or additional procedures; and (3) the burden added safeguards would impose on the state's fiscal and administrative interests. *Id.* at 335; *accord Dusenberry*, 534 U.S. at 167–68.

The Defendants assume without conceding that Snodgrass had a protected liberty interest in observing Ramadan.[17] Def. Br. 18. Rather, they argue that Snodgrass received all the process he was due under the circumstances. *See id.* at 19–20. In particular, the Defendants argue that the Request Snodgrass submitted on March 24, 2013, provided notice of ROSP's removal policy and that Snodgrass's name was only removed from the Sunni master pass list because he missed more than three consecutive Sunni services between April 16 and May 1, 2013. *Id.* at 19; *see also* King Aff. ¶ 6.

The Request warns that inmates who "miss three (3) consecutive services of any selected Religious Group may be removed from the group's master pass list and not allowed to attend services until they submit a new Request to Attend Religious Services at the facility's next open enrollment period." Compl. Attach. 4. But it does not indicate that inmates whose names are not on a master pass list for religious "services" also cannot participate in non-congregational holy day/season observances, such as Ramadan. *See id.* Further, the Defendants do not dispute Snodgrass's assertion that ROSP officials did not enforce this policy when Snodgrass observed Ramadan in 2012. Pl. Aff. ¶ 7; *see also* King Interrog. Ans. 15; Mathena Interrog. Ans. 20. On this record, a reasonable factfinder could conclude that the Request itself was not "reasonably calculated, under all circumstances, to apprise" Snodgrass that he could not observe the 2013 Ramadan fast if he did not regularly attend Friday prayers. *Mullane*, 339 U.S. at 315 ("[W]hen notice is a person's due, process which is a mere gesture is not due process. The means

---

[17] There can be no genuine dispute that Snodgrass had a protected "liberty interest in observing the Ramadan fast, derived from his constitutional free exercise right." *Lovelace v. Lee*, No. 7:03cv395, 2007 WL 2461750, at *20 (W.D. Va. Aug. 24, 2007).

28

employed must be such as one desirous of actually informing the [affected person] might reasonably adopt to accomplish it.").

King also concedes that Snodgrass "was not provided with the Ramadan information" in 2013. King Aff. ¶ 7. Snodgrass realized this by chance in mid-June and promptly filed grievances attempting to put his name on the Ramadan pass list before the fast began on July 8, 2013. *See* Compl. Attachs. 1–3. In rejecting those requests, King and Mathena "simply reiterated their policy" without considering whether "applying the policy in so rigid a manner" might unjustifiably deprive Snodgrass of his constitutionally protected (and clearly established) free-exercise rights. *Wall*, 741 F.3d at 500 ("A prison may not condition an inmate's constitutionally protected rights on so narrow a set of grounds without 'render[ing] the policy arbitrary or irrational.'" (quoting *Turner*, 482 U.S. at 89–90)).

For example, Snodgrass correctly points out that he could not attend Jumah (Friday prayers) until ROSP officials approved his request on April 16 and that there were only two consecutive Fridays between April 16 and May 1, 2013. Pl. Br. in Opp. 2; *Year 2013 Calendar-United States*, timeanddate.com, http://www.timeanddate. com/calendar/?country=1&year=2013. It does indeed seem impossible for Snodgrass to have missed three consecutive Jumah in two weeks. Pl. Br. in Opp. 2. The Defendants do not address this glaring discrepancy, or explain how their perfunctory responses afforded Snodgrass "a meaningful opportunity to present [his] case" for participation in the 2013 Ramadan fast. *Mathews*, 424 U.S. at 349; *cf. Wall*, 741 F.3d at 501 (noting that the ROSP defendants failed to satisfactorily explain "why an individualized interpretation in Wall's case would have been unduly burdensome").

Considering the lack of notice and the perfunctory rejections of Snodgrass's grievance, a reasonable factfinder could conclude that Mathena and King intentionally excluded Snodgrass

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 29 of 33   Pageid#: 295

from the 2013 Ramadan fast without due process of law. *Cf. Burks v. Pate*, 119 F. App'x 447, 450–51 (2005) (vacating summary judgment for defendant prison officials where the record contained "no evidence . . . that Burks was given notice and an opportunity for a hearing prior to the debiting of his prison trust account"). Accordingly, I recommend that the District Court **DENY** the motion for summary judgment on the merits of Snodgrass's due process claims for declaratory and injunctive relief against Mathena and King in their official capacities and for damages against Mathena and King in their individual capacities.[18]

D.    *Equal Protection*

Finally, Snodgrass alleges that the Defendants violated his right to practice his religion "equally and freely as all other prisoners" free from "racial and religious discrimination." Am. Compl. ¶ 28(B), (E). The Fourteenth Amendment's Equal Protection Clause prohibits state government "decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To succeed on this claim, Snodgrass must first show that he was treated differently than similarly situated inmates and that the unequal treatment resulted from intentional or purposeful discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If Snodgrass made that showing, the court would then consider whether the disparate treatment was "justified under the requisite level of scrutiny." *Id.*

In 2013, ROSP's holy day/season participation policy classified inmates by their housing assignments. Inmates housed in general population, like Snodgrass, had to show that they attended weekly religious services on a regular basis. *See* Mathena Aff. ¶¶ 6, 10–12, 14, 20. Inmates housed in segregation could sign up without making this showing. *See id.* ¶¶ 6, 11–12.

---

[18] However, I recommend that the Court **GRANT** the motion on Snodgrass's claim for damages against Mathena and King in their official capacities, Def. Br. 7. *See Will*, 491 U.S. at 71.

The policy distinguished between segregated and non-segregated inmates because the former could not attend group religious services. *See id.* ¶ 6.

Snodgrass is in all relevant respects like the other inmates housed in ROSP's general population, not the entire inmate population. *Cf. DePaola v. Va. Dep't of Corr.*, No. 7:12cv592, 2013 WL 6804744, at *5 (W.D. Va. Dec. 20, 2013) ("The court finds that for purposes of DePaola's claim, he is in all relevant respects and similarly situated to [other] inmates participating in the common fare program, not the entire inmate population."). He has not alleged any facts suggesting that ROSP applied its participation policy differently among the inmates housed in general population. *Cf. id.* (finding that the inmate had "not alleged that other common fare participants receive the Christmas feast, and [that] the equal protection clause does not entitle him to special treatment relative to those similarly situated inmates"). That omission entitles the Defendants to judgment as a matter of law on this claim.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the District Court grant in part and deny in part the Defendants' motion for summary judgment, ECF No. 17. Specifically, I recommend that the District Court:

1.     **GRANT** the motion for summary judgment on all claims against Hinkle and dismiss him from this lawsuit;

2.     **GRANT** the motion for summary judgment on Snodgrass's RLUIPA claims for damages against Robinson, Mathena, and King;

3.     **DENY** the motion for summary judgment on Snodgrass's RLUIPA claims for declaratory and injunctive relief against Robinson, Mathena, and King in their official capacities;

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 31 of 33   Pageid#: 297

4. **GRANT** the motion for summary judgment on Snodgrass's free exercise claims for damages against Robinson, Mathena, and King in their official capacities;

5. **DENY** the motion for summary judgment on Snodgrass's free exercise[19] and due process claims for declaratory and prospective injunctive relief against Mathena and King in their official capacities;

6. **DENY** the motion for summary judgment on Snodgrass's free exercise[20] and due process claims for damages against Mathena and King in their individual capacities;

7. **GRANT** the motion for summary judgment on Snodgrass's due process claims for damages against Mathena and King in their official capacities; and

8. **GRANT** the motion for summary judgment on Snodgrass's equal protection claims against all Defendants in their official and individual capacities.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

---

[19] Robinson did not move for summary judgment on this claim. *See supra* n.9.

[20] Robinson did not move for summary judgment on this claim. *See supra* n.9.

Case 7:14-cv-00269-GEC-PMS   Document 40   Filed 07/21/15   Page 32 of 33   Pageid#: 298

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: July 21, 2015

Joel C. Hoppe
United States Magistrate Judge